MOBILE & OHIO RAILROAD COMPANY vs. R. J. MOSELEY, Sheriff, etc.

1. RAILROAD: *Charter thereof. Exemption from taxation.*
An exemption from taxation contained in the charter of a corporation organized under it is irrepealable and inviolable.

2. SAME: *Case in judgment.*
The charter of appellant contained a provision that no tax should be levied upon its road until it was paying eight per cent. on its cost, etc. A large body of land was donated by Congress to the state for the purpose of aiding in the building of a road from Chicago to Mobile. These lands were afterwards granted by the state to appellant, which claims exemption for them also under the same provision. *Held,* that under the charter all the real and personal property of every sort, necessary to and used in the actual business of the company as a common carrier, is exempt from taxation, and that this exemption can only be met by proof that the portion of the road located in this state has annually earned a sufficiency to pay the required rate of interest; but that the company took the detached lands as any other citizen of the state, subject to the exercise of the taxing power, and does not occupy such a position toward them as inhibits the levy of a tax upon them in the same manner and for the same purpose that other lands are taxed.

3. TAXES: *Injunction to restrain the collection thereof.*
The general rule is that, when a portion of a tax sought to be enjoined is legally due, a bill of injunction will not be entertained unless the portion properly collectible is paid or tendered.

APPEAL from the Chancery Court of *Lauderdale* County.

Hon. JOHN J. DENNIS, Chancellor.

Appellant claimed exemption from taxation of its road and detached lands upon the following grounds: Section 3, of the charter of incorporation is in following words: "That whenever any portion of said railroad shall be completed through this state, and is paying an interest of eight per cent. per annum on its cost, and not before, such portion may be taxed the same percentage, and no more, upon the capital expended in the construction thereof, as lands in this state shall be taxed." Acts of 1848, p. 94.

Its detached lands were granted to the state by act of Congress, September 20, 1850, for the purpose of aiding in the construction of a railroad from Chicago to Mobile, and they were to be used for no other purpose, and, in default of the completion of the road in ten years, the state was to pay the United States the moneys arising from the sale of said lands, and those remaining unsold were to revert to the United States. The legislature of this state, by act approved January 28, 1852, granted the lands to the railroad company, requiring bond of indemnity to save harmless the state from any violation by the company of the terms of the original grant. Congress, by its act approved February 18th, 1859, ratified this transfer, and extended the time for the completion of the road to the year 1865. The bill alleged that the road in Mississippi had never earned the required rate of interest since its completion in 1865, and alleged that irreparable injury would result from a levy and sale by the tax collector of its personal property, because all its rolling stock was necessary for the performance of a mail contract with the United States, and a failure to deliver the mails daily would subject them to heavy penalties; that a multiplicity of suits would be instituted against it by passengers and affreightors; that the tax collectors of other counties through which the road runs would subject it to other expensive litigation in regard to the taxes in those counties, and that a tax sale of land would cast a cloud upon the title to it.

*G. N. Stewart* and *Harris & George*, for appellants.

*Hamm & Ferrell* and *Geo. E. Harris*, Attorney General, for appellees.

[Reporters regret that, after the briefs were taken from the record to be condensed, they misplaced them.]

Chalmers, J., delivered the opinion of the court.

The case stands on bill and demurrer. By the bill the Mobile & Ohio Railroad Company claim exemption from state and county taxation under and by virtue of the 3d section of their original charter, granted by act of 17th of February, 1848, which section is in the following words: "That whenever any portion of said railroad shall be completed through this state, and is paying an interest of eight per cent. per annum on its cost, and not before, such portion may be taxed the same percentage, and no more, upon the capital expended in the construction thereof, as lands in this state shall be taxed."

The bill alleges that neither the whole road, nor that portion of it located exclusively in this state, nor any part of that portion, is now paying, nor ever has paid, eight per cent. per annum upon the capital expended in the construction thereof; nor, indeed, has it ever paid such per cent. upon the capital invested in its construction if its whole net earnings during its thirteen years of completed existence were aggregated, much less an *annual* interest of eight per cent. upon such cost. Notwithstanding these facts it is alleged that the tax assessor of Lauderdale county has assessed against, and the tax collector thereof is attempting to collect from, said corporation a large sum for state and county taxes alleged to be due by it. The prayer was for an injunction.

It is insisted by the demurrer to the bill and by counsel for the tax collector that the words of the section of the charter relied on are too vague and uncertain to support the claim for exemption, which, it is correctly argued, is never presumed nor allowed unless explicitly and clearly granted.

9

We think the language of the section susceptible of no other construction than that the corporation is to be exempt from all taxation until by its earnings it shall pay an annual interest of eight per cent. upon that portion of its road sought to be taxed, after which period its road shall be subject to taxation at the rate per cent. that lands are taxed by the general revenue laws of the state then in force. If the language employed seems awkward, it is not for us, by verbal refinements, to strip it of its manifest meaning and intention.

That such exemption from taxation contained in the charter of a corporation organized under it is irrepealable and inviolable, is too well settled to need elucidation or citation of authorities. No principle has been more repeatedly or more violently assailed; none has more successfully withstood the shock of every assault. It is believed that no good purpose can be subserved by an extended discussion of it.

. The claim of exemption can only be successfully met in this case, so far as the point now under consideration is concerned, by answer and proof showing that, in point of fact, the earnings of that portion of the road located in Mississippi have been sufficient to pay an annual interest of eight per cent. upon the capital expended in the construction thereof. If it can be shown that the earnings have been really sufficient for that purpose, but that they have been fraudulently diverted with a view to the continuance of the exemption, the same end would be accomplished   We incline further to the opinion that if it can be shown that the earnings of the Mississippi portion of the road have sufficed to pay the required interest on such portion, and that this result has only been defeated by their abstraction and expenditure on those portions lying in Alabama, Tennessee, and Kentucky, the exemption must cease.

It is urged, however, that the exemption was repealed, and the repeal acquiesced in or accepted by the road, by the provisions of 15th section of an act incorporating the Southwestern Air Line Extension Railroad, approved 27th of February, 1854 (acts of 1854, p. 516), by the terms of which all the

railroads in the state, whether theretofore or thereafter chartered, were exempted from taxation for a period of twenty years from that date. This twenty years expired in 1874, and before the passage of the law imposing the tax which is here sought to be enjoined. It is insisted that inasmuch as the last recited act gave an absolute exemption from taxation, while the charter of the Mobile & Ohio Railroad Company only granted an exemption conditioned upon the non-earning of a certain dividend, the act of 1854 was more favorable to the company than its own charter; and that, having enjoyed the benefits of said act during the period of its existence, said company cannot now fall back, after its expiration, upon their charter. If it could be made to appear that, at any time during the continuance of the absolute exemption provided by the act of 1854, the company, by its earnings, have come within the operation of the taxing power of the state, so far as its chartered exemption was concerned, and had escaped the exercise of that power by virtue of the act of 1854, there would be much force in the position, especially if it could be shown that the company had in any manner affirmatively claimed the protection of said last-mentioned act. So far is the bill in this case from disclosing such state of facts that, on the contrary, it is expressly affirmed that at no time have the earnings of the road, or of any portion thereof, equaled the percentage required.

It is argued, however, that it is not shown by the bill that, during the twenty years following the act of 1854, the road was in the habit of making any showing of its earnings to the authorities of the state with a view of entitling itself to the exemptions of its charter, and that this must be taken as an abandonment of such exemption and an election of that granted by the act of 1854. We cannot so regard it. There was nothing in the charter of the company requiring any exhibit of its earnings. There is nothing to show that any such exhibit was ever made, either before, during, or since the period covered by the act of 1854. If it was done it was an act of super-

erogation, and no adverse inference could be drawn from its discontinuance. If at any time the state had reason to believe that the limit of earnings required by the charter had been reached she could have imposed her tax, when, if opposition thereto was made by the company, the question of fact could have been tested. The same course will remain open to her in the future. Our conclusion is that, so far as the railroad proper is concerned, including the franchise, road-bed, right of way, rolling stock, depot grounds and buildings, machine-shops and machinery, in short, every sort and species of property, real and personal, necessary to and used in the actual business of the company as a common carrier of passengers and freight, the same is exempt from all taxation until the event indicated in the 3d section of the charter shall have transpired.

If this decision results in the exemption, practically perpetual, of an enormous moneyed monopoly, we can only express the hope that it may at least serve as a warning to future legislatures.

The bill alleges that, in addition to the real estate belonging to the company which may be said to be immediately annexed to and necessary in the conduct of its business, the corporation holds large bodies of land in various counties of the state which are detached from the road itself, and it claims that these lands are also exempt from taxation.

These lands were derived from the United States government, through the state of Mississippi, in the following manner:

On the 20th of September, 1850, two years after the incorporation of complainants' company by the state of Mississippi, the Congress of the United States granted to the states of Illinois, Alabama, and Mississippi large bodies of lands, situated in those states respectively, for the purpose of aiding in the construction of a railroad from Chicago to Mobile. Said lands were to be applied to the construction of said road exclusively, and to no other purpose, and the road when built was to remain forever free for the transportation of all troops or property of the United States. The road was to be completed in ten years,

and in default thereof the states were required to repay to the United States government all money which might have been realized by the sale of any portion of the lands, and the portion thereof remaining unsold should revert to the federal government.   9 Statutes at Large, 466.

By act of the legislature of this state of January 28, 1852, the lands so granted to the state were vested in complainants' corporation.   By act of Congress of February 18, 1859, this action of the Mississippi legislature was ratified, and the time for the completion of the road extended to 1865.

Of the lands thus conveyed to complainants they allege in their bill that a large portion remains still unsold by them, and it is claimed that such is protected from taxation.

This claim is vested upon two grounds :   1st, that the state holds said lands as a trustee, and therefore cannot tax them ; 2d, that they are covered by the general exemption from taxation contained in the charter.

It may be readily admitted that if the state occupies towards these lands a fiduciary relation she cannot impose a tax upon them, since the power to tax carries with it the power to sell, and thus to defeat and destroy the object of the trust.   On the familiar principle that a trustee can do nothing to impair the value of the trust estate, or to diminish its ultimate enjoyment by the *cestui que trust*, it may be conceded that the state cannot derive a source of revenue for herself from that which has been intrusted to her for the benefit of another.

It is impossible, however, to see how the state bears at present this relation to the lands in question.   They were granted to her by Congress for a certain purpose.   By the act of 1852, in execution of this purpose, she conveyed them to complainants.   Under the terms of the grant to her she came under obligations to the federal government, if the road was not completed within ten years, to return to the United States all money derived from sales of the land.   By her act of conveyance to complainants she exacted of them a bond to hold her harmless against the obligations exacted by the general government.   It

must be presumed that this bond was executed.   By the act of
1859, Congress ratified the conveyance made by the state to
complainants, and extended the time limited for the completion
of the road to 1865.   The only fiduciary relation left resting
upon the state was that imposed upon her in favor of the United
States if the road remained uncompleted at this last named
period.   But the bill shows upon its face that the road was
completed thirteen years before its own filing—that is to say, in
1862.   Moreover the trust relationship which continued up to
that time was wholly between the state and the national govern-
ment, with which complainants had no connection save that by
their bond they were obligated to indemnify the state.   If,
during that period, the state had imposed a tax on these lands,
it is impossible to see how the corporation could have com-
plained so long as the United States government did not do so.

If any doubt existed as to the correctness of these views,
they must be considered as put at rest by the recent decision
of the Supreme Court of the United States in the case of
Tucker v. Ferguson, 22 Wallace, 528, which is strikingly
analogous.   In that case lands had been granted by Congress
to the state of Michigan to aid in the construction of a rail-
road, and these lands were subsequently conveyed by said
state to a railroad corporation, with an exemption from taxa-
tion for seven years embraced in the statute of conveyance.
The seven years having expired, and much of the land remain-
ing unsold in the hands of the company, the latter resisted
the imposition of any tax thereon by the state on the ground,
among others, that as to said lands the state occupied a
fiduciary relation which forbade her to tax them.   Speaking
of the obligations under which the state had come to the
general government in relation to these lands, and which were
in all respects similar to those in the case at bar, the court
say :   " We see no ground upon which it can be claimed that
she bound herself any further.   Upon general principles she
could not tax the lands while the title remained in the United
States, nor while she held them as the trustee of the United

States, which in the view of the law is the same thing.  But when the state, proceeding in the execution of the trust, had transferred her entire title to the company, and they had perfected their title and acquired the right to sell, the case assumed a very different aspect.   *   *   *   *   *   The company, so far as the matter of right is concerned, are upon a footing with all other alienees of the United States.   The imposition of taxes can in no just sense be said to be a diminution of the value of the land.   If Congress had thought so they would have forbidden it.   Liability to taxation is an incident to all real estate."   Again, in another connection, the court say: "If the fact were otherwise it would be for the United States, by office found or other proper proceedings, to assert their rights.   But they do not complain, and complainants cannot do it vicariously for them."

We consider this case as decisive of the point under discussion, and we entirely concur in its reasoning.

The only material point of difference between the case of Tucker v. Ferguson, *supra*, and the one at bar consists in the fact that in that case the railroad company had mortgaged their unsold lands, while it is not shown by the bill in this case whether the lands have been mortgaged or not.

We cannot see that this affects the principle, unless, indeed, the mortgage would make a stronger case for the road, inasmuch as it might be argued that the lands had thereby become directly connected with the superstructure itself, and the holders of the mortgage debt might claim that it should stand to them as a security, untouched by the state, for the money which they had invested in the enterprise.   Indeed the general solicitor of complainants, in a printed argument, prepared we presume before the decision in Tucker v. Ferguson was announced, states that the lands of complainants have been mortgaged, and suggests the argument indicated above.

The only case we have found militating in any degree against the conclusions here reached, and that very slightly if at all, is the case of Railway Company v. Prescott, 16 Wall.; 603 ; and that case is expressly overruled in Railway Company

*v.* McShane, 22 Wall., 444.   We conclude, therefore, that the state occupies no relation to these lands which inhibits the imposition of a tax upon them.

Are the lands protected from taxation by the 3d section of complainants' charter? That clause provides for the exemption of "any portion of said railroad," etc.   At the date of its enactment the lands in question had not been granted by Congress to the state.   They were not conveyed by the state to the company for more than four years thereafter.   It is impossible, therefore, that they could have been within the legislative contemplation.   But are they covered by the language of the act?

The very numerous cases involving a consideration of what species of property is embraced within a legislative exemption from taxation in favor of corporate or individual enterprises will be found in the copious notes to Mr. Cooley's recent work on Taxation.   He states the rule generally to be that such exemption will embrace all the property held by the corporation "necessary to effect the purpose of the incorporation, but not other property held by it, which, though convenient and tending to increase the profits, is not necessary to the corporation and its business."   Cooley on Taxation, 151; ib., 149, 150, and notes.

An examination of the authorities has not disclosed any case where the exemption was held to embrace property so entirely disconnected with the business of the corporation as are the lands in this instance.   The rule already announced in the preceding portion of this opinion is as broad as that established by any well-considered case, and more liberal than that held in many of them.

We are of opinion that complainants' lands, held under the grant from the federal government through the state, are proper subjects of taxation by the latter.

The demurrer challenges the jurisdiction of a court of equity to entertain this suit, upon the ground that a bill will not lie to enjoin the collection of taxes.

The bill, seeming to concede this general principle, seeks to

bring itself within its well-settled exceptions by various allega-
tions of special circumstances.

It is alleged that complainants are under contract with the
United States government for the daily transportation of its
mails, with heavy penalties provided for each and every failure
to deliver them promptly ; that the use of their entire rolling
stock is necessary for this purpose, and that a levy and sale
thereof by the tax collector would subject them to irreparable
loss at the hands of the government, and to countless suits at
the hands of passengers and affreighters ; that the road trav
erses a large number of counties ; that a multiplicity of suits
with the tax collector of each county is unavoidable ; and that
tax sales of the real estate of complainants will cast clouds
upon their title.   These allegations are, we think, sufficient to
give the court jurisdiction under the principles recognized in
McDonald v. Murphree, 45 Miss., 705, and Richardson v.
Scott, 47 Miss., 236.   See, also, Watson v. Sutherland, 5
Wallace, 74 ; Davis v. Chicago, 11 Wallace, 108.

It is well settled that where a portion of a tax sought to be
enjoined is legally due, and a portion not, that the bill for
injunction cannot be maintained unless the portion properly
collectible is paid or tendered.   Cooley on Taxation, 537, and
authorities cited in note.

There was no payment nor offer of payment of the taxes due
on the detached lands in the case at bar, but, there having been
final decree in the court below against complainants and the
sureties on the injunction bond for the statutory damages on
the whole amount of the taxes assessed, the decree will be
reversed, and cause remanded to be proceeded with in accordance
with the views here announced, and with leave to defendants to
answer in sixty days.

Upon final hearing decree for damages will be rendered upon
the amount of taxes assessed and enjoined as to the detached
lands, and such decree as to the taxes on other property as may
then seem right and proper in view of the answer and proofs.